FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

JAN 06 2006

at 2 o'clock and 44 min M
SUE BEITIA, CLERK

BRANDON K. MITCHELL,                )    CIV. NO. 02-00648 ACK-LEK
                                    )
            Plaintiff,              )
                                    )
    vs.                             )
                                    )
CITY AND COUNTY OF HONOLULU;        )
HONOLULU POLICE DEPARTMENT;         )
LEE DONOHUE, Chief of Police;       )
MICHAEL A. GOEAS, in his            )
individual and official             )
capacity as an HPD Officer;         )
BRIAN T. BASCAR, in his             )
individual and official             )
capacity as an HPD Officer;         )
DOE HONOLULU POLICE                 )
OFFICERS 1-25, et al.               )
                                    )
            Defendants.             )
_____)

## ORDER DENYING PLAINTIFF'S MOTION FOR NEW TRIAL

### BACKGROUND

**I.   Procedural Background**

On October 8, 2002, Plaintiff Brandon Mitchell

("Plaintiff") initiated this lawsuit alleging that he suffered a

fractured skull and resulting hematoma while in the custody of

the Honolulu Police Department on the evening of October 9, 2000.

Plaintiff's Second Amended Complaint, filed on February 13, 2004,

sets forth the following claims for relief against Defendants

City and County of Honolulu ("City"), Honolulu Police Department

1

("HPD"), Lee Donohue, in his individual and official capacity ("Donohue"), Michael Goeas ("Goeas"), in his individual and official capacity, Brian Bascar ("Bascar"), in his individual and official capacity, and Doe HPD Officers ("HPD Officers") (collectively, "Defendants"): (1) Police Brutality/ Use of Excessive Force in violation of 42 U.S.C. Sec. 1983 (against HPD, Goeas, Bascar and unknown HPD Officers), (2) Unlawful Arrest and Detention (against Goeas), (3) Monell Claim (against HPD), (4) Violation of 28 U.S.C. § 1367(a) (against Defendants), (5) Negligent Supervision and Retention (against City, HPD and Donohue), (6) Assault and Battery (against HPD Officers, including Goeas and Bascar), (7) Negligence (against Defendants, including Goeas and Bascar), (8) Intentional Infliction of Emotional Distress ("IIED") (against HPD Officers, including Goeas and Bascar), (9) Negligent Infliction of Emotional Distress ("NIED") (against HPD Officers, including Goeas and Bascar).

On November 10, 2004, Defendants filed a Motion for Summary Judgment.  At the February 22, 2005 hearing on Defendants' Motion for Summary Judgment, Plaintiff's counsel conceded that Plaintiff was abandoning all claims against Donohue as well as his claims of Unlawful Arrest and Negligent Supervision and Retention.  Finally, this Court's February 23, 2005 Order found that Donohue is entitled to qualified immunity and, alternatively, summary judgment on the merits as to

2

Plaintiff's Section 1983 claims; granted Defendants' Motion for
Summary Judgment as to Plaintiff's Section 1983 claim based on
excessive force as to the City, HPD, and all Defendants in their
official capacity; granted Summary Judgment as to Plaintiff's
Section 1983 Claim based on Unlawful Arrest and Detention;
granted Defendants' Motion for Summary Judgment as to Plaintiff's
Negligent Supervision and Retention claim; granted Defendants'
Motion for Summary Judgment as to Plaintiff's Monell claim; and
dismissed Plaintiff's claim regarding 28 U.S.C. § 1367(a).

On October 31, 2005, at the final pre-trial conference,
Plaintiff made an oral motion to amend the Complaint to include a
claim for failure to provide for his medical needs in violation
of his Fourteenth Amendment rights under the United States
Constitution.  Plaintiff's claims were tried by a jury beginning
on November 1, 2005.  On November 2, 2005, Defendants filed an
Opposition to Plaintiff's Oral Motion to Amend Pleadings.  On
November 15, 2005, Plaintiff filed a Memorandum in Support of
Plaintiff's Oral Motion to Amend Pleadings.  On November 18,
2005, the Court Granted Plaintiff's motion to amend the
Complaint.  At the end of Plaintiff's case-in-chief, Defendants
made a Rule 50 Motion for Judgment as a Matter of Law, which the
Court denied.  On November 29, 2005, Plaintiff's counsel informed
the Court that Plaintiff was dropping his claims of assault,
negligent infliction of emotional distress, and intentional

3

infliction of emotional distress.

On December 6, 2005, the jury found in favor of
Defendants as to each of Plaintiff's remaining claims - Excessive
Use of Force in Violation of the Fourth Amendment to U.S.
Constitution, Failure to Provide for Plaintiff's Medical Needs in
Violation of the Fourteenth Amendment to the U.S. Constitution,
Battery, and Negligence.  The jury also found that Defendants
Goeas and Bascar were acting within the course and scope of their
employment as police officers with Defendant City and County of
Honolulu.

On December 15, 2005, Plaintiff filed a Motion for a
New Trial.  On December 23, 2005, Defendants filed an Opposition
to Plaintiff's Motion for a New Trial.  The Court finds the
motion suitable for disposition without a hearing.  See L.R.
7.2(d).

## II.  Applicable Law

### A.    Excessive Use of Force

"The Fourth Amendment sets the applicable
constitutional limitations for considering claims of excessive
force during pretrial detention." Lolli v. County of Orange, 351
F.3d 410, 415 (9th Cir. 2003) (citation and internal quotation
marks omitted).  Claims of excessive use of force, in violation
of the Fourth Amendment, are evaluated using the Fourth
Amendment's objective reasonableness standard.  Id.  "'The

4

'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer . . . rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. Finally, "[d]etermining whether a police officer's use of force was reasonable or excessive . . . 'requires a careful attention to the facts and circumstances of each particular case' and a 'careful balancing' of an individual's liberty with the government's interest in the application of force." Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002) (quoting Graham, 490 U.S. at 396).

       To hold a defendant liable for excessive use of force, a plaintiff must also prove that the defendant was an integral participant or personally involved in the unlawful conduct. See Boyd v. Benton County, 374 F.3d 773, 780 (9th Cir. 2004) (holding jury instruction improper that allowed liability to attach, under the Fourth Amendment, to a mere bystander who had no role in the unlawful conduct); Jones v. Williams, 297 F.3d 930, 936 (9th Cir. 2002) (holding that either integral participation or personal involvement was required before a jury could find officers liable

5

for unlawful search).  However, "'integral participation' does
not require that each officer's actions themselves rise to the
level of a constitutional violation."  Id.

**B.    Failure to Provide for Medical Needs**

When brought by a detainee who has not been charged
with nor convicted of a crime, claims of failure to provide care
for serious medical needs are analyzed under the substantive due
process clause of the Fourteenth Amendment.  Lolli, 351 F.3d at
418-19 (citing Gibson v. County of Washoe, 290 F.3d 1175, 1187
(9th Cir. 2002)).  Under traditional Eighth Amendment standards
used in Fourteenth Amendment claims of failure to provide for
medical needs, the plaintiff must show that he was 1) confined
under conditions posing a risk of objectively, sufficiently
serious harm and 2) that the officer had a sufficiently culpable
state of mind in denying the medical care.  Id.  Objectively,
sufficiently serious harm exists when the detainee has a serious
medical need, and the failure to treat that condition could
result in further significant injury or the unnecessary and
wanton infliction of pain.  See Clement v. Gomez, 298 F.3d 898,
904 (9th Cir. 2002) (citations omitted).

To satisfy the second prong of the analysis, the
plaintiff must establish that the officer was deliberately
indifferent to a substantial risk of serious harm.  Id. (citation
omitted).  Thus, "[a] defendant is liable for denying medical

6

care only if he 'knows of and disregards an excessive risk to inmate health and safety.'" Lolli, 351 F.3d at 419 (quoting Gibson, 290 F.3d at 1187). To know of the risk, it is not enough that the defendant is "merely aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, he must also draw that inference." Id. (internal citation and quotation marks omitted). Officers "'are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment.'" Id. (quoting Hallet v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002)). Mere negligence is insufficient to establish liability. Clement v. Gomez, 298 F.3d 898 at 904 (citation omitted).

Finally, "deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm," and the jury may determine that an officer knew of a substantial risk from the very fact that the risk was obvious. Lolli, 351 F.3d at 421 (citing Farmer v. Brennan, 511 U.S. 825, 842 (1994)).

C.  **Negligence**

Under Hawaii law, a police officer has a duty to exercise reasonable care for the safety of prisoners in his custody. Haworth v. State of Hawaii, 592 P.2d 820, 824 (Haw. 1979). The Supreme Court of Hawaii has held that because of the

7

special relationship created by a state's custody of a prisoner, it is under a duty to take reasonable action to protect the prisoner against unreasonable risk of physical harm. <u>Id.</u> Thus, "when the custodial authorities are charged with knowledge that the prisoner may incur harm unless preclusive measures are taken, reasonable care must be exercised to prevent such harm." <u>Id.</u> at 825.

## **STANDARD**

A motion for new trial is governed by Federal Rule of Civil Procedure 59 ("Rule 59"), which provides in relevant part:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Fed. R. Civ. P. 59(a).

### **A.    Against the Clear/Great Weight of the Evidence, Seriously Erroneous Result, or Miscarriage of Justice**

The United States Court of Appeals for the Ninth Circuit has stated variously that district courts have discretion to grant Rule 59 motions when the verdict is "against the clear [or 'great'] weight of the evidence," when the evidence shows that the jury has reached a "seriously erroneous result," and/or when the evidence shows that acceptance of the verdict would cause a "miscarriage of justice." <u>See</u> <u>EEOC v. Pape Lift, Inc.</u>,

8

115 F.3d 676, 680 (9th Cir. 1997) (internal quotations and
citations omitted) ("Although the court's ruling on an
alternative motion for a new trial involves the exercise of some
discretion, a stringent standard applies when the motion is based
on insufficiency of the evidence.  A motion will be granted on
this ground only if the verdict is against the great weight of
the evidence, or it is quite clear that the jury has reached a
seriously erroneous result."); Roy v. Volkswagen of America, 896
F.2d 1174, 1176 (9th Cir. 1990) ("The trial court may grant a new
trial, even though the verdict is supported by substantial
evidence, if the verdict is contrary to the clear weight of the
evidence, or is based upon evidence which is false, or to
prevent, in the sound discretion of the trial court, a
miscarriage of justice.") (citing Hanson v. Shell Oil Co., 541
F.2d 1352, 1359 (9th Cir. 1976)) (internal quotation omitted);
Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371
(9th Cir. 1987) ("If there is substantial evidence presented at
trial to create an issue for the jury, a trial court may not
grant a motion for a directed verdict or for judgment
notwithstanding the verdict.  The existence of substantial
evidence does not, however, prevent the court from granting a
motion for a new trial pursuant to Fed. R. Civ. P. 59 if the
verdict is against the clear weight of the evidence.").

        While the Court has discretion to assess the evidence

9

within these frameworks ("against the clear weight of the evidence," "seriously erroneous result," "miscarriage of justice"), the standard for finding insufficient evidence warranting a new trial remains high. See Roy, 896 F.2d at 1176 ("While the trial court may weigh the evidence and credibility of the witnesses, the court is not justified in granting a new trial 'merely because it might have come to a different result from that reached by the jury.'") (citing Wilhelm v. Associated Container Transportation (Australia) Ltd., 648 F.2d 1197, 1198 (9th Cir. 1981).

In most cases, the judge should accept the findings of the jury; however, if the judge is left with the definite and firm conviction that a mistake has been committed, he may grant a new trial:

> On the one hand, the trial judge does not sit to approve miscarriages of justice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter . . . . If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

<u>Landes</u>, 833 F.2d at 1371-72 (internal quotation and citations omitted).  "The judge can weigh evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." <u>Id.</u>

### 2.  Harmless Error

Where a motion for new trial is based on allegations that the Court committed an error, the error must be harmful to warrant a new trial.  Federal Rule of Civil Procedure 61 ("Rule 61") provides that the court should not grant a new trial, set aside a verdict, or modify a judgment unless refusal to do so would be inconsistent with substantial justice.  Rule 61 states:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.  The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

In other words, a new trial is not justified if an error was harmless.  <u>See</u> <u>Glanzman v. Uniroyal, Inc.</u>, 892 F.2d 58, 61 (9th Cir. 1989) ("If an error does 'not affect the substantial rights of the parties' it will be deemed 'harmless' and not grounds for reversal or appeal."  This concept under Rule 61 applies at trial court and on appeal).

11

## DISCUSSION

In his Motion for New Trial, Plaintiff requests a new trial based on the following arguments: (1) the verdict is contrary to the clear weight of the evidence and is a miscarriage of justice; (2) Plaintiff was unduly prejudiced by the denial of Plaintiff's Fourth Motion In Limine and through the admission into evidence of Plaintiff's juvenile arrest records; (3) the Court erroneously refused to give Plaintiff's Amended Proposed Jury Instructions Nos. 5 and 14, regarding the doctrine of res ipsa loquitur; (4) the Court erroneously refused to give Plaintiff's Proposed Jury Instruction No. 6, regarding integral participation, and instead erroneously gave Defendants' Supplemental Proposed Jury Instruction No. 14; (5) the Court erroneously gave the jury instructions regarding Plaintiff's comparative fault, Defendants' Supplemental Proposed Jury Instructions Nos. 20 (as modified), 21, and 22.

### 1. **Weight of the Evidence**

This case arises out of Plaintiff's, October 9, 2000, arrest for Driving Under the Influence of Alcohol and Driving Without a License.  The evidence presented at trial established that on the afternoon of October 9, 2000, Plaintiff, who was then a juvenile, finished a bottle of Bacardi rum with four of his friends.  Virgil Shinnery ("Shinnery"), one of the friends with whom Plaintiff had been drinking, testified that when they were

12

done drinking, Plaintiff appeared to be buzzed and you could tell that he had been drinking but that Plaintiff was not drunk.[1] Shinnery also testified that Plaintiff was angry from a phone call that he had received from his ex-girlfriend, Tapria Foust ("Tapria"). Shinnery further testified that Plaintiff then made a few phone calls to Plaintiff's friend, Keaka Miller ("Keaka"), regarding money that Keaka owed Plaintiff and that Plaintiff was angry after making these calls.

Eventually, Plaintiff drove from his residence in Makakilo to Kapolei to the home of Keaka's girlfriend, Robin Matishak ("Matishak"), to collect the debt from Keaka. Plaintiff and Keaka got into a fight in which Plaintiff was struck on the left side of his face hard enough that it caused him to fall to the ground. Shawn Jones ("Shawn") was with Plaintiff throughout the encounter in Kapolei. Shawn testified that when they arrived at Matishak's home, they told Matishak's little brother to go inside and get Keaka; that Keaka came out; and that Keaka and Plaintiff then started bickering, making hand movements, and moving around in a circular motion. Shawn further testified that Plaintiff threw a swing at Keaka but it was slow due to the intoxication, then Keaka pushed Plaintiff down with two hands and Plaintiff fell on his hands and butt, Plaintiff got back up and

---

[1] Shawn Jones, a friend of Plaintiff that drove with him to Kapolei, testified that Plaintiff was acting slowish and drunken and he could tell that Plaintiff had been drinking.

was moving around, and Keaka then punched him in his face.  Shawn testified that Keaka used his left hand to hit Plaintiff's left cheek and jaw and that Plaintiff fell to the ground again.  Shawn described the punch as a jab and stated that after the punch, Plaintiff was holding his cheek, there was some redness on Plaintiff's face, and Plaintiff lost interest in fighting and returned to the Buick.  Shawn also explained that Plaintiff was less than 155 pounds and Keaka was approximately 200 pounds and that Plaintiff should not have ever tried to fight with Keaka because Plaintiff was no match for Keaka.  Shawn also stated that the punch could be heard from approximately seven feet away.  Shawn testified that he could not recall what the dispute was about.

Goeas, an officer with the HPD, was dispatched to Kapolei after receiving a complaint of a fight in progress.  Goeas testified that when he arrived at the scene, Plaintiff and another male were sitting in a Buick, with the doors closed, near Matishak's home.  Goeas proceeded to assist another officer, Officer Contrades, in calming two males who were jumping up and down and yelling at each other on the street corner.  Goeas testified that he was approached by a loud, hostile woman who was pointing to the vehicle, in which Plaintiff was sitting, and stated that Plaintiff was a friend from school that came to collect a debt from her boyfriend Keaka.  Goeas testified that

the woman, who was later identified as Matishak, explained that
Keaka punched Plaintiff out and that Plaintiff drove off
recklessly, fish-tailing down the street.[2]  Goeas and Coleman
then went to the Buick where Plaintiff was sitting to speak with
him.  Goeas testified, and his report and Plaintiff's witnesses
confirmed[3], that Plaintiff was smiling and joking with the
officers and that when the officers asked his name he gave the
officers several conflicting answers.  Goeas testified that after
approximately ten minutes of this exchange, Plaintiff became
irritated and began ignoring the officers and sighing and
eventually got out of the car.  Goeas further testified that when
Plaintiff stepped out of the car, Goeas noticed a strong smell of
alcohol, Plaintiff was swaying, and Plaintiff told him that he

---

[2] At trial, Matishak denied telling officer Goeas that Keaka
punched Plaintiff out or that Plaintiff fish-tailed down the
street.  Matishak did testify, however, that Plaintiff drove off
and that the car that Plaintiff was driving made a screeching
sound.  Matishak also testified that Plaintiff tried to punch
Keaka and missed, Keaka pushed Plaintiff and Plaintiff fell down,
Plaintiff got back up and Keaka jabbed Plaintiff in his jaw and
Plaintiff fell on his butt, and that Plaintiff got back up but by
then the police were coming and Plaintiff did not want to fight
anymore.  Matishak stated that she was "completely positive" that
Keaka's jab went to Plaintiff's jaw and not to his head and that
Plaintiff fell on his butt.  She also explained that Keaka used a
closed fist, Keaka was not hurt as a result of the incident, and
that Keaka was significantly bigger than Plaintiff.

[3] Shawn testified that Plaintiff was responding slowly, was
not saying the truth, was giving the officers the runaround, and
was acting like the encounter was a game.  Shawn also stated that
the questioning was friendly at first and then more and more
serious and that eventually the officers started to swear.

had been drinking.

Plaintiff agreed to submit to a field sobriety test, which Goeas then administered.  Plaintiff failed the test[4] and the HPD Incident Report regarding Plaintiff's arrest indicates that Plaintiff "failed all 3 tests given, he had a very hard time listening and following directions."  (Ex. 1).  After administering the field sobriety test, Goeas arrested Plaintiff for driving under the influence and driving without a license. Upon arrest, Plaintiff's attitude changed, he got loud, began demanding his Miranda Rights, and swearing at the officers. Plaintiff also resisted being placed inside the police vehicle for transport.[5]  Shawn explained that Plaintiff was in a drunken, resistant state and was complaining that the handcuffs were too tight.  Shawn further testified that he told Plaintiff to calm down and that he was going to tell the officers to take Plaintiff to the hospital.

Officer Goeas then took Plaintiff to Waianae Coast Comprehensive Health Center ("WCCHC") because he had been in a fight with Keaka and was told by Shawn that Plaintiff needed medical attention.  Goeas testified that Shawn told him that

_____

[4] Shawn testified that Plaintiff looked like he was failing the field sobriety test.

[5] The parties stipulated that Plaintiff is not claiming damages for any injury that may have occurred as a result of any action of the officers at the scene of the arrest.

16

Plaintiff had been "knocked out" but that Plaintiff said that he had only been pushed down.  Shawn testified that he never said that Plaintiff was "knocked out" or "punched out."  The parties do not dispute that parental permission was required before medical treatment could be rendered, since Plaintiff was a minor.  However, it is unclear when, by whom, and what was said during the telephone conversations to Plaintiff's mother, Patricia Anthony ("Anthony").

Goeas testified that when he arrived at WCCHC with Plaintiff, he contacted Plaintiff's mother and informed her that her son had been arrested for driving under the influence and she asked if she could come get her son.  Goeas also testified that WCCHC would not accept Plaintiff without parental consent and that Plaintiff was examined while Goeas was on the phone with Plaintiff's parents.  Goeas testified that Plaintiff had not complained of headaches at this point.  Plaintiff's mother, however, testified that she received a call from the Waianae police station at approximately 8:10-8:15 p.m. and that the caller informed her that Plaintiff was in custody; Plaintiff had complained about his head hurting; normally when a detainee is involved in a confrontation, he is taken to the hospital; and the caller was seeking her permission to take Plaintiff to WCCHC.

Nurse Christine Ching ("Ching") examined Plaintiff in the emergency department at WCCHC.  The WCCHC record of

Plaintiff's examination indicates that Plaintiff was brought in by the HPD at 1936 with a superficial abrasion on his left big toe and with no further complaints. (Ex. 12). The record also states that Plaintiff was a seventeen year old male who was in no apparent distress and whose vital signs were stable. (Ex. 12). Ching testified that after Plaintiff's vital signs, history, and complaints were taken by another nurse, Ching examined Plaintiff. Ching testified that her normal practice would be to go in and ask the patient why he was there and ask the officer why the patient was arrested and how long he had been detained. Ching also stated that she would independently examine the patient for signs of intoxication and if she felt he was intoxicated, she might do further neurological tests and consult with a physician.

Ching examined Plaintiff's skin and noted a superficial abrasion on his left great toe and no swelling; his head, eyes, ears, nose and throat and noted within normal limits; his cardiovascular system and noted regular rate and rhythm, S1 S2, no murmur; his respiratory system and noted clear auscultation, no wheeze; and his abdomen and noted soft, non-tender, positive bowel tones times 4. (Ex. 12). Ching testified that normally she would indicate whether a patient was oriented but she did not note that on Plaintiff's record. She also did not document any alcohol on Plaintiff's breath. Ching determined that Plaintiff was fit for incarceration. (Ex. 4). Finally, the WCCHC record

18

of Plaintiff's examination indicates that Plaintiff was released into HPD custody at 1950.  (Ex. 12).

Goeas and Plaintiff arrived at the Waianae Police Station at approximately 7:55 p.m.  Upon entering the station, Goeas conducted a custodial search of Plaintiff at the receiving desk and a form entitled Statement of Receipt of Detainee's Property ("Property Form") was filled out.  (Ex. 3).  The Property Form indicates that it was completed at 2015 and that Plaintiff had no property.  (Ex. 3).  The Property Form also bears the signatures of Plaintiff and Goeas.  (Ex. 3).  Goeas testified that Plaintiff was taken from the receiving desk to the booking room.  Goeas testified that he then started typing out a booking report and completed the report at 8:39 p.m.  Goeas further testified that at 8:45 he read Plaintiff a form entitled Sanctions of Section 286-151.5 HRS Refusing to Submit to Testing for Measurable Amount of Alcohol ("Sanctions Form").  (Ex. 5). The Sanctions Form indicates that it was completed at 2045; bears the signatures of Goeas and Plaintiff; and contains a note written by Goeas that states, "[Plaintiff] listened and was cooperating with this paperwork as I read it to him."  (Ex. 5).

Goeas testified that up until 8:45 Plaintiff's condition was the same as when he entered the station but that between 8:45 p.m. and 9:00 p.m. Plaintiff's condition deteriorated.  A form entitled Administrative Revocation of

19

Driver's License was completed at 2100 ("Administrative Revocation Form"). (Ex. 6). The Administrative Revocation Form is signed by Goeas and Bascar but is not signed by Plaintiff and the form states that Plaintiff appeared very intoxicated. (Ex. 6). A form entitled Notice of Administrative Revocation states that it was completed at 2100 and that Plaintiff was unable to be tested, for his alcohol concentration, or sign the form. (Ex. 7). Goeas testified that an intoxilyzer test was administered to Plaintiff at 9:27 p.m. but that Plaintiff was unable to complete the test, appeared very sleepy, was unable to stand alone, and had a strong smell of alcohol.

A form entitled Sworn Statement of Intoxilyzer 5000 Operator was signed by Bascar and states that Plaintiff was under his observation from 2100 until 2127 when Bascar attempted to administer the test, that Plaintiff refused to sign the form, and that Plaintiff "[a]ppeared to be in a very sleepy state/unable to stand alone without using walls & tables/strong odor of alcohol emitting from breath." (Ex. 9). Goeas testified that after Bascar attempted to administer the intoxilyzer test, Goeas fingerprinted Plaintiff and Bascar photographed Plaintiff. The Identification Record Form, on which Plaintiff was fingerprinted, states that Plaintiff was photographed by Bascar at 2130 and printed by Goeas at 2130 and that Plaintiff was unable to sign the form. (Ex. 11). Goeas further testified that while

Plaintiff was being fingerprinted he became unable to stand, was vomiting and spitting, had to be held up, and cried out "oh mama." Goeas testified that Plaintiff vomited at least three times, there was food in the vomit, and it had a strong smell of alcohol. The Incident Report completed by Goeas regarding Plaintiff's arrest states that "[w]hile attempting to book [Plaintiff], he threw up numerous times in the Waianae Station's booking area. He then became unable to stand up, Officer B. Bascar had to hold [Plaintiff] up to print him and mug him. [Plaintiff] then began crying and yelling but still could not hold himself up. [Plaintiff] unable to sign other required paperwork and could not do the breath test." (Ex. 1).

        Bascar testified that he remembers Goeas bringing Plaintiff into the Booking Room but that he did not see the inventory check because he was in the Booking Room waiting for Goeas to bring Plaintiff back to the Booking Room. Bascar testified that Plaintiff was unstable when Bascar first saw him and described Plaintiff as having wobbly knees but could not say whether Plaintiff could stand on his own. Bascar further explained that Goeas had to hold onto Plaintiff to keep him from falling and that Bascar told Plaintiff to hold onto the table. Bascar stated that Goeas sat Plaintiff down at the table and Plaintiff had his head down. When Plaintiff stood up, Bascar told him to hold onto the wall and table. Bascar stated that

Plaintiff was first fingerprinted, then photographed, and then
the intoxilyzer test was administered. He explained that
fingerprinting Plaintiff was difficult because Plaintiff had to
be held up and that Plaintiff kept spitting and dry heaving but
that Plaintiff did not vomit or fall during the booking process.

Bascar stated that he witnessed Goeas reading Plaintiff
the Sanctions Form so Bascar signed as a witness, (Ex. 5), and
that Plaintiff was able to sign the form at 8:45 p.m. Bascar
also testified that he witnessed and signed the Administrative
Revocation Form, (Ex. 6), but that Plaintiff could not sign or
refused to sign that form. Bascar administered the intoxilyzer
test and he testified that the machine had a three minute time
limit to get a sample, the machine required Plaintiff to blow
hard, Plaintiff had to stand to take the test, and Plaintiff was
unable to blow hard enough to complete the test. Bascar
testified that Plaintiff was limp when he entered the booking
room, he got worse while there, was unable to walk out by himself
but that Plaintiff did not yell, scream, or moan.[6]

---

[6] On cross-examination, Plaintiff's counsel questioned
Bascar as to the time sequence of his participation in
Plaintiff's booking. Plaintiff's counsel referred to the Arrest
Report and Statement of Receipt of Detainee's Property of Eric
Ragragola ("Ragragola"), another detainee at the Waianae Police
Station on October 9, 2000. The documents were not admitted into
evidence. Based on the testimony concerning the times noted on
the forms, Plaintiff's counsel questioned Bascar as to how he
could have participated in Plaintiff's booking while also
participating in the arrest and booking of Ragragola.
Ragragola's Arrest Report indicated that he was received by the

Goeas testified that when the Desk Sergeant, Henry Cheung, came to the booking room and asked if an ambulance was needed, Goeas declined the ambulance.  Goeas testified that when he turned Plaintiff over to his parents, he recommended to Plaintiff's mother that Plaintiff receive medical treatment. Bascar testified that he tried to hurry Plaintiff out of the station because Plaintiff was "messed up" and Bascar was concerned that Plaintiff "might knockout or something."  Bascar also testified that the officers talked to William Rushing ("Rushing"), Plaintiff's mother's partner who accompanied her to pickup Plaintiff from the station, and told Rushing that he better take Plaintiff to the hospital because he was too drunk and that they could not get a reading on the intoxilyzer machine. Rushing testified that he did not recall having any conversations with officer Bascar.  Bascar testified that Goeas and Rushing took Plaintiff to the car and that Bascar went back inside and mopped up the spit in the booking room and he did not see any vomit.

Plaintiff's mother, Patricia Anthony ("Anthony"),

_____

Desk Sergeant at Waianae Police Station at 2028, the Arrest Report was completed at 2050, and the Statement of Receipt of Detainee's Property indicates a time of 2050.  The HPD Juvenile Report relating to Plaintiff's October 9, 2000 arrest indicates that he was received at the Waianae Police Station at 1955 and his release was authorized at 2037.  (Ex. 2).  Bascar explained that Ragragola's Arrest Report was prepared by another officer, officer Prado, and that the times on the forms relating to Ragragola might be wrong.

testified that when Plaintiff was released from police custody,
Plaintiff was being supported by one officer on each side of him,
his shirt was wet, he did not have shoes on, he was slumped over,
could not walk on his own, and could not form words well.
Rushing testified that Plaintiff was being held up by the
officers, he had a strong smell of vomit and faint smell of
alcohol, his shirt was wet, and he was barefoot.  Anthony said
that Goeas told her that boys will be boys and do not be too hard
on him.  Anthony further testified that Goeas told her that
Plaintiff had alcohol poisoning and that it would take a few days
to get out of his system.  Anthony denied that Goeas advised her
to seek medical treatment for Plaintiff and Rushing stated that
he did not recall any conversations with either Goeas or Bascar.
Anthony also testified that Plaintiff said "Mama I've been shot"
or "Mama I've been shocked."

        Anthony testified that when Plaintiff, Rushing, and
Anthony arrived at their home, Rushing and David Richardson
("Richardson"), Plaintiff's brother, brought Plaintiff into the
downstairs family room because they could not get him upstairs.
Anthony and Rushing testified that they tried to lay Plaintiff
down but he would not.  The recollections of Plaintiff's family
members as to what happened next are inconsistent.  The
inconsistencies could cause a reasonable jury to doubt the
credibility of some of these witnesses.

Anthony testified that everyone else went upstairs, but she stayed downstairs washing towels and that Plaintiff was never left alone and was always in her sight.  On cross-examination, Anthony stated that she did not leave Plaintiff but also stated that she went outside to rinse out some towels.  Anthony stated that at some point, Plaintiff screamed and that she threw down the hose and went inside and Richardson and Rushing came downstairs and brought Plaintiff upstairs.  Anthony testified that when Plaintiff was taken upstairs, he did not want to go to his room so they sat him on the couch.  Anthony further testified that Plaintiff never fell but he could not stand or walk on his own.  Anthony stated that to her knowledge someone was with Plaintiff at all times.

Rushing testified that after placing Plaintiff on the couch downstairs, the family left him sitting there for awhile. On direct examination, Rushing testified that Plaintiff had thrown-up downstairs and that Rushing and Richardson took Plaintiff upstairs.  Rushing stated that Rushing and Richardson tried to take Plaintiff to his bedroom, then to the couch and that they ended up putting him on a chair in the living room. Rushing testified that the next time he saw Plaintiff, he was in the same condition and Anthony and Claudia Richardson ("Claudia"), Richardson's wife, were with Plaintiff.  Rushing stated that Plaintiff could not walk around without assistance

25

and that he never fell because he was always either sitting down
or being helped.  However, on cross-examination Rushing admitted
that in his deposition he had stated that after helping to bring
Plaintiff into the downstairs family room, Rushing went upstairs
and did not see Plaintiff again until the next morning and that
at that time Plaintiff was upstairs.  Rushing had also stated in
his deposition that no one else was with Plaintiff in the morning
when Rushing saw him sleeping in the living room, upstairs.  When
asked about the inconsistencies between his trial and deposition
testimony, Rushing replied that he did not remember.  Finally,
Rushing stated that he did not remember whether he stayed
upstairs all night, after bringing Plaintiff into the downstairs
family room.

          Richardson testified that when Rushing and Anthony
arrived home with Plaintiff, Richardson helped to get Plaintiff
onto the couch in the downstairs family room.  Richardson stated
that Plaintiff was in a really bad condition, was yelling and not
talking straight, and was moaning and putting his hand to the
left side of his head.  Richardson testified that when Plaintiff
screamed during the night, they decided to take Plaintiff
upstairs to the living room.  Richardson further testified that
he stayed with Plaintiff all night and gave him liquids and that
Plaintiff would not sleep or rest and Plaintiff kept trying to
get up and move.  Richardson stated that Plaintiff's legs were

wobbly and that Plaintiff would try to get up and move around but
that it was like he was sleep walking.  Richardson testified that
Plaintiff did stumble and stagger but that Plaintiff never hit
the ground and never hit his head.  Richardson further testified
that Plaintiff stumbled on the stairs and that Richardson kept
picking him up but Plaintiff never fell and never hit his head.
On cross-examination, Richardson stated that Plaintiff was
brought upstairs in the middle of the night because Plaintiff was
screaming and then the family started watching him.

    Claudia, Richardson's wife, stated that when Rushing
and Anthony returned home with Plaintiff, Plaintiff looked sick
and could not walk so they were helping him.  Claudia stated that
we went upstairs after awhile but heard Plaintiff scream, so we
all went downstairs to check on him.  Claudia stated, on re-
direct, that it had been a couple of minutes from the time that
they left Plaintiff downstairs until they heard the scream.
Claudia explained that Plaintiff was moving his head but he was
in the same position as when they left him.  Claudia testified
that they did not want to leave Plaintiff downstairs so Anthony,
Richardson, and Claudia brought Plaintiff upstairs.  Claudia
further testified that Richardson tried to lay Plaintiff down in
his room, Plaintiff kept trying to get up, Plaintiff could not
walk on his own, and Plaintiff would stumble when he tried to
walk.  Claudia explained that Richardson went with Plaintiff to

27

Plaintiff's bedroom and that Anthony and Claudia went into the living room.  Claudia stated that Plaintiff was never left alone once they brought him upstairs and that he never fell down the stairs.

Two days after his arrest, October 11, 2000, Plaintiff's condition had not improved so Richardson took him to St. Francis Medical Center West Emergency Services.  The Emergency Services Record from St. Francis Medical Center West indicates that Plaintiff was "brought in by brother" and that Plaintiff had been sleepy; had exhibited bizarre behavior; had not been walking, talking, or making sense; and had fallen several times.  (Ex. 400 at 006).  The Emergency Services Treatment Record also indicates under a section entitled "Chief Concern" that "2 days ago had 'alcohol poisoning' and fell down stairs - not acting right, urinating on self."  (Ex. 400 at 007).  Richardson testified that he does not remember telling anyone that Plaintiff fell down the stairs and that they must have misinterpreted what he said.  Richardson testified that Plaintiff never fell, he stumbled.[7]

Doctor Calvin Kam ("Dr. Kam") is the neurosurgeon who

---

[7] Plaintiff's expert in neuropsychology, Doctor Harold Hall ("Dr. Hall"), testified that in compiling the Relevant History portion of his report he was told that Plaintiff had fallen down several times after his release from police custody.  Dr. Hall stated that this was reported at least by Anthony and perhaps others.

removed Plaintiff's epidural hematoma.  Dr. Kam testified that
his records indicate that Plaintiff had a "large epidural
hematoma" and that because the hematoma was of a significant
size, it required surgical removal.  When asked if he determined
the cause of Plaintiff's epidural hematoma, he explained that
such an injury usually comes from a blow to the head but what
kind of blow, he had no idea.  Upon further questioning, Dr. Kam
stated that Plaintiff's injury likely resulted from a blow to the
head and that in his opinion he would anticipate that it was
inflicted by a blunt object, as opposed to a heavier object like
a hammer, because Plaintiff did not have bruising or a laceration
to the skull.  Dr. Kam further explained that a blunt object
could be a fall on a set of stairs, a rail, or on the floor.
When asked by Defendants if he knew when the injury occurred, Dr.
Kam stated that all he could say was that it was recent, between
one to four days prior to the surgery.  Dr. Kam also testified
that Plaintiff had a mildly depressed fracture, with no bone
chips, so he described it as linear.  Dr. Kam testified that
normally when a patient hits his head, he will have a headache
right away if he is coherent but noted that here the Ambulance
Report Form, from Plaintiff's transfer from St. Francis Medical
Center West Emergency Services to St. Francis Medical Center
West, showed that Plaintiff had no headaches.

          Doctor Thomas Rogers ("Dr. Rogers"), Plaintiff's expert

in neurosurgery, stated that it was his opinion that Plaintiff's
injuries were caused by a significant blunt force trauma to the
left side of Plaintiff's head.  Dr. Rogers further explained that
he believed that the blunt force had to be produced by something
with "some kind of edge" because Plaintiff sustained a linear
crack with some depression.  Dr. Rogers testified that it is an
indisputable fact that Plaintiff's injury must have been caused
by a significant force such as passing out and hitting an object
on the way to the floor or falling off of a skateboard without a
helmet.  However, Dr. Rogers also testified, on direct
examination, that it took significant force to create Plaintiff's
injury and stated that such an injury does not just happen such
as by falling while playing soccer.  Dr. Rogers testified that it
was very improbable that a blow or a fist could have caused
Plaintiff's injury and that if it was, it would probably break
the person's hand.

        Dr. Rogers testified that it was his opinion that
Plaintiff's injury most likely occurred while he was in police
custody.  Dr. Rogers based this opinion on his review of the
records of Plaintiff's exam at WCCHC, the police records, and
other records.  In particular, Dr. Rogers pointed to the fact
that, in conducting Plaintiff's clearance exam, nurse Ching from
WCCHC had examined Plaintiff's ear, which was within one half of
one inch of Plaintiff's injury, and Plaintiff did not complain of

head pain[8] and the fact that Plaintiff experienced marked
deterioration while at Waianae Police Station.  Dr. Rogers
concluded that Plaintiff's injury must have occurred between 8:30
and 9:00 p.m. because Plaintiff experienced deterioration during
that time as evidenced by his inability to sign police forms.
Dr. Rogers stated that alcohol can mask pain and that he did not
know how much or what type of alcohol Plaintiff consumed but that
he did not believe that was an issue here because in order to not
feel the pain of Plaintiff's injury, a person would have to be so
intoxicated that he could not walk.  Dr. Rogers stated that the
history provided by Plaintiff's mother, Anthony, did not indicate
that Plaintiff's injury occurred at home.

        Dr. Rogers also testified that he could not tell from
just looking at the blood clot how long it took to collect
without also considering the patient's history.  He further
testified that here it looked like the swelling of Plaintiff's
brain, as evidenced by the CT scan taken on October 11, 2000 took
"a day or so" and later stated "well one and a half days before
when Plaintiff was at the station."  Dr. Rogers stated that
Plaintiff's brain appeared dark on the CT Scan and that the type
of swelling that Plaintiff had took a day or so to develop.

        Based upon its careful review of the evidence, the

---

    [8] Dr. Rogers also admitted, however, that even the St.
Francis Medical Center West records do not indicate that
Plaintiff was experiencing head pain or headaches.

Court finds that the jury's verdict was supported by substantial evidence and was not against the clear or great weight of the evidence, was not seriously erroneous, and did not result in a miscarriage of justice.  Therefore, Plaintiff is not entitled to a new trial on those bases.

   2.   **Plaintiff's Fourth Motion In Limine and Juvenile Arrest Records**

        Plaintiff's Fourth Motion In Limine sought to exclude evidence regarding Plaintiff's juvenile arrests[9] and/or convictions and/or any alleged prior use or involvement with illegal drugs.  (Pl.'s Fourth Mot. at 1-2).  In his Motion, Plaintiff argued that FRE 609(d) prohibits the admission of any juvenile conviction; that evidence of Plaintiff's prior arrests or alleged drug use was inadmissable under FRE 404(a) and (b); and that such evidence was inadmissable under FRE 403 because its probative value was substantially outweighed by the danger of unfair prejudice.  (Pl.'s Memo in Support of Fourth Mot. at 3).

        FRE 609(d) states, in relevant part, "Evidence of juvenile adjudications is generally not admissible *under this rule* [Impeachment by Evidence of Conviction of Crime]."  Fed. R. Evid. 609(d) (emphasis added).  Citing to Powell v. Levit, 640

_____

        [9] Plaintiff's juvenile arrest record included his January 27, 2000 arrest for Promoting a Dangerous Drug in the Third Degree (Possession of Marijuana); May 10, 2000 arrest for Theft in the Fourth Degree (Beer from Makakilo Handy Pantry); and May 10, 2000 arrest for Truancy.  (Pl.'s Mot. for New Trial at 5).

F.2d 239, 241 (9th cir. 1981), Plaintiff claimed, in his Fourth
Motion In Limine, that the United States Court of Appeals for the
Ninth Circuit has held that evidence of juvenile adjudication is
inadmissible in a civil case and that the trial court has no
discretion to allow any inquiry into a plaintiff's juvenile
record. (Pl.'s Memo in Support of Fourth Mot. at 3-4). The
Court's November 1, 2005 Order ["November Order"] Denying
Plaintiff's Fourth Motion In Limine, found that the scope of FRE
609(d) is "limited to evidence offered to impeach by proving
character for untruthfulness. Thus, evidence offered to prove
the witness's conduct for some other purpose, such as one
permitted under Rule 404(b), is not regulated by [Rule 609(d)]."
Wright & Gold, <u>Federal Practice and Procedure: Evidence</u> § 6138;
<u>see also</u> Fed. R. Evid. 609(d) advisory committee notes ("juvenile
adjudication is not usable for impeachment"). The Court's
November Order also noted that, in <u>Powell</u>, the Ninth Circuit
explained that "FRE 609(d) provides that evidence of prior
juvenile adjudication is generally inadmissible *to attack the*
*credibility of a witness* . . . ." <u>Powell</u>, 640 F.2d at 241
(emphasis added).

        Here, Defendants sought to introduce evidence regarding
Plaintiff's prior juvenile adjudications for purposes other than
to attack his credibility. (Defs.' Memo. in Opp. to Pl.'s Fourth
Mot. at 6). Defendants argued that such evidence went directly

to the issues of causation and damages.  (Defs.' Memo. in Opp. to
Pl.'s Fourth Mot. at 8-9).  More specifically, Defendants claimed
that evidence regarding Plaintiff's prior criminal citations was
critical for the jury to (1) fully understand and evaluate the
basis and reasoning for Drs. Sbordone and Levine's opinions; (2)
properly determine whether Plaintiff's current physical and
mental condition are merely manifestations of preexisting
depression, anger, and unresolved emotional issues or due to the
head trauma allegedly inflicted while he was in police custody;
(3) decipher what damages, if any, are due to the alleged head
injury; and (4) fairly assess Plaintiff's alleged loss of future
earnings, if any.[10]  (Defs.' Memo. in Opp. to Pl.'s Fourth Mot.
at 11).  The Court's November Order found that FRE 609(d) did not
prohibit the introduction of Plaintiff's juvenile arrests for
those purposes.

　　　　Plaintiff also argued that evidence regarding
Plaintiff's juvenile arrests and/or convictions and/or any
alleged prior use or involvement with illegal drugs was
inadmissible under FRE 404(a) and (b).  FRE 404(a) states,
"Evidence of a person's character or a trait of character is not

---

　　　　[10] The Court notes that Plaintiff's Sixth Claim for Relief in
his Second Amended Complaint stated that "[b]ecause of
Defendants' actions, [Plaintiff] has lost valuable life skills,
the ability to hold meaningful employment, and the ability to
provide an income for himself and his family, and has suffered
damages in an amount to be proven at trial."  (Second Amended
Compl. ¶ 38).

admissible *for the purpose* of proving action in conformity
therewith on a particular occasion . . . ."  Fed. R. Evid. 404(a)
(emphasis added).  FRE 404(b) explains, "Evidence of other
crimes, wrongs, or acts is not admissible to prove the character
of person in order to show action in conformity therewith.  It
may, however, be admissible for other purposes, such as proof of
motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident . . . ."  Fed. R.
Evid. 404(b).

      Defendants argued that FRE 404 was inapplicable because
they did not intend to suggest to the jury that Plaintiff was
using marijuana or other illegal drugs on October 9, 2000 other
than having consumed alcohol.  (Defs.' Memo. in Opp. to Pl.'s
Fourth Mot. at 7).  FRE 404(b) does not prohibit the introduction
of evidence of other crimes, wrongs, or acts other than to prove
the character of a person in order to show action in conformity
therewith.  <u>See</u> Fed. R. Evid. 404(b) advisory committee notes.
Here, as discussed above, Defendants sought to introduce evidence
of Plaintiff's prior criminal citations to dispute causation and
damages.  (Defs.' Memo. in Opp. to Pl.'s Fourth Mot. at 8-9).

      Plaintiff also claimed that evidence regarding
Plaintiff's juvenile arrests and/or convictions and/or any
alleged prior use or involvement with illegal drugs should have
been excluded pursuant to FRE 403.  Under FRE 403, "Although

relevant, evidence may be excluded if its probative value is *substantially* outweighed by the danger of *unfair* prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403 (emphasis added).

Here, the Court found that evidence of Plaintiff's prior citations for theft, truancy, and drug possession all occurred within months of the subject incident and were, as Defendants suggested, probative of whether Plaintiff's current mental and physical condition is merely a continuation of prior psychological and behavioral issues or whether his current condition is the result of a head trauma allegedly inflicted while he was in police custody.  Defendants' experts, Drs. Sbordone and Levine, both reviewed and relied on records pertaining to Plaintiff's arrests in arriving at their conclusions.  (Defs.' Memo. in Opp. to Pl.'s Fourth Mot. at 3). For example, Dr. Levine opined, in relevant part, that Plaintiff's "arrest record indicates in the months preceding this event . . . the road he was taking during the initial several months preceding the subject event" and that "there are clear behavioral and psychiatric issues that preceded this event and I strongly suspect that we are now viewing these issues which, absent this . . . event, would have remained just the same. . . .

What he manifests currently is the residua of his preexistent depression, anger, and unresolved emotional issues which again were manifested and would have continued to manifest absent any type of alleged head injury sustained in this event." (Ex. 1 of Defs.' Memo. in Opp. to Pl.'s Fourth Mot. at 10-11). Similarly, Dr. Sbordone concluded, "Based on a review of [Plaintiff's educational, criminal and medical records, and my examination, it is my opinion, to a reasonable degree of medical certainty, that [Plaintiff] is malingering to obtain secondary gains." (Ex. 3 of Defs.' Memo. in Opp. to Pl.'s Fourth Mot. at 10-11).

        The Court found that the arrests were also relevant and probative as to the issue of damages and alleged loss of future earnings. Plaintiff argued that the introduction of such evidence would be unfairly prejudicial. Under FRE 403, unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note; accord United States v. Gonzalez-Flores, 413 F.3d 1093, 1098 (9th Cir. 2005). While the Court acknowledged that the introduction of evidence regarding Plaintiff's prior citations would be adverse to Plaintiff, the Court's November Order found that such evidence would not result in "unfair" prejudice and any prejudice that might have resulted from the introduction of such evidence would not substantially outweigh its probative value. The Court's

37

November Order permitted evidence regarding Plaintiff's prior criminal citations for theft, truancy, and drug possession, provided that Defendants did not introduce such evidence for purposes prohibited by FRE 609 and FRE 404.  The Court's November Order also stated that the Court would give a limiting instruction advising the jury that they were not to consider the evidence for the purposes prohibited by FRE 404 and 609.

Plaintiff's Fourth Motion In Limine also requested the exclusion of a statement by Lizabeth Myers, contained within Dr. Levine's Review of Records dated July 20, 2003, regarding an alleged drug deal that went bad on the night of the alleged events.  (Ex. D of Pl.'s Fourth Mot.).  Dr. Levine's Review of Records was not admitted into evidence pursuant to the Court's ruling on Plaintiff's Second Motion In Limine.  With respect to Ms. Myers' statement, as contained within Dr. Levine's report, the Court found that the probative value of the statement did not substantially outweigh its prejudicial effect and, accordingly, Granted Plaintiff's Fourth Motion In Limine as to Ms. Myers' statement.  Finally, the Court's November Order required the parties to seek the Court's approval, outside of the hearing of the jury, before eliciting testimony as to any other alleged drug use and/or dealing by Plaintiff.

Plaintiff now claims that Defendants' arguments raised in opposition to Plaintiff's Fourth Motion In Limine were a ruse

to get bad character evidence before the jury and that once the Court permitted Defendants to present evidence of Plaintiff's prior arrests, Plaintiff was forced to try to deal with the implications of Plaintiff's juvenile arrests without Defendants having to raise the issue themselves.  (Pl.'s Mot. for New Trial at 6).  Plaintiff further argues that the admission of such evidence permitted Defendants to attack the credibility and integrity of Plaintiff as well as Patricia Anthony, his mother, and William Rushing, his mother's partner.  (Pl.'s Mot. for New Trial at 6).

        The Court notes that reference was first made to Plaintiff's prior arrests in Plaintiff's Opening Statement; Plaintiff does not cite any instance in which Defendants elicited testimony regarding Plaintiff's prior arrests; and Defendants did not seek to introduce Plaintiff's arrest records for marijuana possession, theft, and truancy (Defendants Proposed Exhibits 217, 218, and 219) and thus the exhibits were not introduced into evidence.  "Generally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." Ohler v. United States, 529 U.S. 753, 755 (2000) (citation omitted).  Plaintiff argues, however, that he was prejudiced because once the Court ruled on Plaintiff's Fourth Motion In Limine, Plaintiff was forced to deal with the implications of Plaintiff's prior arrests without Defendants having to raise the

issue.  The United States Supreme Court has held that "in limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial."  <u>Ohler</u>, 529 U.S. at 758 n.3 (<u>citing</u> <u>Luce v. United States</u>, 469 U.S. 38, 41-42 (1984)).  Accordingly, a party who preemptively introduces evidence of a prior conviction on direct examination, may not claim on appeal that admission of such evidence was error, even where the trial court had ruled that the evidence was admissible in a motion in limine.  <u>See</u> <u>id.</u> at 755.

Finally, the Court requested, on several occasions, that Plaintiff provide the Court with a limiting instruction regarding Plaintiff's prior arrests and Plaintiff chose not to submit such an instruction until the end of trial.  The Court instructed the jury, as stipulated by the parties, as to the limited purpose for which they could consider any evidence of Plaintiff's prior arrests.[11]  It can thus be presumed that the

_____

[11] The Court read the following limiting instruction to the jury, as stipulated to by the parties:

> You have heard testimony during this trial that Plaintiff Brandon Mitchell had been arrested by the police before he was arrested on October 9, 2000.  These incidents are also recorded in exhibits that you will receive at the end of the trial.  This evidence was allowed because the expert witnesses considered Brandon Mitchell's personal history in evaluating his medical and psychological conditions.  You may consider this evidence for the limited purposes of deciding the weight and credibility of the

jury did not consider any reference made regarding Plaintiff's prior arrests for an improper purpose because it is presumed that juries will follow a court's limiting instructions. United States v. Mende, 43 F.3d 1298, 1302 (9th Cir. 1995) (citation omitted). The Court accordingly finds that Plaintiff was not unduly prejudiced by the Court's ruling on Plaintiff's Fourth Motion In Limine, and Plaintiff is not entitled to a new trial on that basis.

3.    **Res Ipsa Loquitur**

On October 26, 2005, Defendants filed their Objections to Plaintiff's Proposed Jury Instructions. In that document, Defendants argued that the doctrine of res ipsa loquitur is not applicable in this case; the Court should not instruct the jury on the doctrine; and the Court should not give Plaintiff's proposed instructions on res ipsa loquitur, Plaintiff's Proposed Jury Instructions Nos. 5 and 14.[12] (Defs.' Objections to Pl.'s

_____

experts' opinions and damages, if any, to be awarded. However, you may not use this evidence to attack Brandon Mitchell's credibility, his character, or to show that because of earlier contact with the police, he acted the same way on October 9, 2000.

[12] Plaintiff's Proposed Instruction No. 5 stated:

It is not necessary for a plaintiff to prove by direct evidence which one of two police officers violated his civil rights. When police officers are uniquely positioned, to the exclusion of others, to know the circumstances that caused a plaintiff's

Proposed Jury Inst. at 14-18).  On November 17, 2005, Plaintiff
filed a Trial Memorandum which argued that the doctrine of res
ipsa loquitur applies to this case and that the Court should
instruct the jury accordingly by giving amended versions of
Plaintiff's Proposed Jury Instruction Nos. 5 and 14.  (Pl.'s
Memo. Re: Res Ipsa at 8-11).  In their Objections to Plaintiff's
Proposed Jury Instructions, Defendants' argued that the doctrine
of res ipsa loquitur is not applicable to this case because there

---

> injury, and the injury would not normally
> occur without wrongdoing on the officers'
> part, you can infer liability against those
> in exclusive control of the event, under the
> following circumstances: 1) The plaintiff
> suffered an injury that does not normally
> occur in the absence of someone's wrongdoing;
> and, 2) The injury was caused by an agent or
> instrumentality within the exclusive control
> of the defendant; and, 3) The injury was not
> due to a voluntary action or contribution on
> the part of the plaintiff.

Plaintiff's Proposed Instruction No. 14 stated:

> You may infer negligence against Defendant
> Michael Goeas and/or Defendant Brian Bascar
> if you find from the evidence that each of
> the following exists: 1) Plaintiff suffered
> an injury that does not normally occur in the
> absence of someone's negligence; 2) The
> injury was caused by an agency or
> instrumentality within the exclusive control
> of the defendants; 3) The injury was not due
> to any voluntary action or contribution on
> the part of the plaintiff.  The inference of
> negligence is a rebuttable one.

42

is evidence that Plaintiff had been drinking and involved in a
fight wherein he was struck in the head and fell to the ground;
that following his release from police custody, Plaintiff fell at
his home and also struck the floor; and that Plaintiff cannot
eliminate the possibility that he or a third party contributed to
his injuries.  (Defs.' Objections to Pl.'s Proposed Jury Inst. at
16).  In response to Defendants' arguments, Plaintiff argued that
any confusion as to the time frame during which the res ipsa
loquitur inference was applicable could be eliminated by
instructing the jury that the inference of negligence for
wrongdoing "only applies if they find Plaintiff was injured while
in police custody."  (Pl.'s Memo. Re: Res Ipsa at 11).  On
November 18, 2005, the Court ruled that the doctrine of res ipsa
loquitur is not applicable to this case.

        In <u>Carlos v. MTL, Inc.</u>, 883 P.2d 691 (1994), the Hawaii
Court of Appeals discussed the elements that must be established
for the doctrine of res ipsa loquitur to apply.  The Court
explained:

                In order to invoke the doctrine of res ipsa
                loquitur in a particular case, this court has
                held that a plaintiff must first establish
                the presence of three conditions or elements:

                1.    The event must be one which
                      ordinarily does not occur in the
                      absence of someone's negligence.
                2.    It must be caused by an agency or
                      instrumentality within the
                      exclusive control of the defendant.
                3.    It must not have been due to any

43

                              voluntary action or contribution on
                              the part of the plaintiff.

Id. at 277-278.

          In this case, Plaintiff failed to establish any of the

elements so as to warrant the application of the res ipsa

loquitur doctrine.  As to the first element, the evidence

presented at trial revealed several possible alternative causes

of Plaintiff's alleged injuries.  It is undisputed that prior to

his arrest, Plaintiff was drinking hard alcohol, involved in a

fight wherein he was punched and fell to the ground, and failed a

field sobriety test administered by Goeas prior to his arrest.

Moreover, despite the conflicting testimony of his family,

discussed above, the evidence established at least the

possibility that Plaintiff had fallen down a flight of stairs at

home following his release from police custody.[13]  See supra

Discussion - Part 1.  The Hawaii Court of Appeals has explained

that "where there are two equally probable and efficient causes

_____

     [13] Of particular significance, the Emergency Services Record
from St. Francis Medical Center West indicates that Plaintiff's
brother brought him in and explained that Plaintiff had been
sleepy; had exhibited bizarre behavior; had not been walking,
talking, or making sense; and had fallen several times.  (Ex. 400
at 006).  The Emergency Services Treatment Record also indicates
under a section entitled "Chief Concern" that "2 days ago had
'alcohol poisoning' and fell down stairs - not acting right,
urinating on self."  (Ex. 400 at 007).  As discussed above,
Richardson testified that he does not remember telling anyone
that Plaintiff fell down the stairs and that they must have
misinterpreted what he said.  Richardson testified that Plaintiff
never fell, he stumbled.

                                  44

of the accident shown either by the pleadings or by the evidence,
or where two equally plausible inferences can be drawn as to the
likelihood of negligence being or not being the cause of
plaintiff's injury the doctrine of res ipsa loquitur is not
applicable."  Id. at 278 (internal citations and quotation marks
omitted).

As to the second element, the Hawaii Court of Appeals
has held that "[t]he burden is on the plaintiff . . . to trace
the injury received to a cause or specific instrumentality for
which the defendant was responsible, or to show that the
defendant was responsible for all reasonable probable causes to
which the accident could be attributed."  Id. at 279 (citation
omitted).  Here, Plaintiff was unable to establish that his own
conduct or that of Keaka did not cause or contribute to his
injuries and thus was unable to satisfy the second element.
Finally, as to the third element, the Hawaii Court of Appeals has
cautioned that "[i]f it reasonably appears that the accident
might have been caused by the plaintiff's own conduct, the
doctrine of res ipsa loquitur would not be applicable to infer
the defendant's negligence."  Id.  Plaintiff did not establish
the third element because, as discussed above, it reasonably
appears that Plaintiff's injuries may have resulted from his
altercation with Keaka prior to his arrest, from Plaintiff's
contributory negligence at the station, or from his own conduct

45

following his release.

Plaintiff cannot satisfy the three elements necessary for the application of the res ipsa loquitur doctrine because he cannot eliminate the possibility that his own conduct or that of Keaka Miller caused or contributed to his injuries. Therefore, the doctrine of res ipsa loquitur is not applicable to this case. Thus, the Court properly refused to give Plaintiff's Proposed Jury Instruction Nos. 5 and 14 and Plaintiff is not entitled to a new trial on this basis.[14]

### 4.    Integral Participation

Plaintiff argues that the Court erred in instructing the jury, as to "integral participation," when it refused to give Plaintiff's Proposed Jury Instruction No. 6[15] and instead gave

---

[14] In ruling that the doctrine of res ipsa loquitur was not applicable to this case, the Court also noted that the doctrine is a negligence doctrine and here Plaintiff alleged that his injuries were the result of intentional torts committed at the Waianae Police Station.

[15] Plaintiff's Proposed Jury Instruction No. 6 states:
        A police officer may be liable under the Federal Civil Rights Law if he actively participated in a police detention during which a plaintiff's civil rights were violated, even if the officer's conduct, by itself, does not constitute a civil rights violation.
        To be an active participant, an officer must be more than a mere bystander or simply present during the detention. For liability to attach, personal participation in the detention must occur.

Defendants' Supplemental Proposed Jury Instruction No. 14.[16]
(Pl.'s Mot. for New Trial at 7).  Citing to Boyd v. Benton
County, 374 F.3d 773, 780 (9th Cir. 2004) and Jones v. Williams,
297 F.3d 930, 936 (9th Cir. 2002), Plaintiff argues that "[t]here
is no requirement that an actor be a 'full, active participant'
in the violation of a plaintiff's civil rights.  It requires only
that the actor be an active participant in *the activity taking
place*, e.g., arrest, search, detention, during which a
plaintiff's civil rights are violated."  (Pl.'s Mot. for New
Trial at 8) (emphasis added).

        However, the United States Court of Appeals for the
Ninth Circuit has clearly established that "a plaintiff [can] not
hold an officer liable because of his membership in a group
without a showing of individual participation *in the unlawful
conduct*."  Jones v. Williams, 297 F.3d at 935 (emphasis added).

---

[16] Defendants' Supplemental Proposed Jury Instruction No. 14
states:
> To hold a Defendant liable under Federal law,
> Plaintiff must prove by a preponderance of
> the evidence that the Defendant was an
> integral participant in the violation of
> Plaintiff's civil rights by the excessive use
> of force.  While "integral participation"
> does not require that each officer's conduct
> by itself rise to the level of a
> constitutional violation, it does require
> proof of more than his mere presence at the
> scene of an unlawful act, or being a mere
> bystander, but that he was a full, active
> participant in the violation of Plaintiff's
> civil rights.

The <u>Jones</u> court went on to reject the idea that mere presence or
membership in a group, "without personal involvement in and a
causal connection *to the unlawful act*, can create liability . . .
." <u>Id.</u> at 939 (emphasis added).  Similarly, in <u>Boyd v. Benton
County</u>, 374 F.3d 773, 780 (9th Cir. 2004), the Ninth Circuit
stated that an instruction is improper if it allows liability to
attach to "'a mere bystander' who had 'no role in *the unlawful
conduct*.'" <u>Id.</u> (emphasis added) (<u>quoting</u> <u>Chuman v. Wright</u>, 76
F.3d 292, 294-95 (9th Cir. 1996).

Here, Plaintiff's Proposed Jury Instruction No. 6
improperly focused on the officers' participation in the
detention rather than in the alleged unlawful conduct as required
by Ninth Circuit precedent.  While in unlawful search cases the
search may be synonymous with the alleged unlawful conduct, here
the unlawful conduct alleged was the excessive use of force and
not the underlying detention.  Defendants' Supplemental Proposed
Jury Instruction No. 14 properly instructed the jury that they
must find that each Defendant was an integral participant in the
violation of Plaintiff's rights by the excessive use of force and
also explained that integral participation does not require each
officer's conduct by itself rise to the level of a constitutional
violation.

Plaintiff also suggests that Defendants' Supplemental
Proposed Jury Instruction No. 14 improperly used the term "full,

active participant." However, that language has been cited with approval by the United States Court of Appeals for the Ninth Circuit in Chuman, 76 F.3d at 294, and in Boyd, 374 F.3d at 780. In Chuman, the Ninth Circuit cited with approval the holding in Melear v. Spears, 862 F.2d 1177 (5th Cir. 1989), in which the Fifth Circuit concluded that a defendant was an integral participant in an unconstitutional search because the defendant "'was a full, active participant in the search, not a mere bystander.'" Chuman, 76 F.3d at 294 (quoting Melear, 862 F.2d at 1186)). In Boyd, 374 F.3d at 780, the Ninth Circuit again quoted with approval the "full, active participant" language from Melear.

Finally, the Court also gave Plaintiff's Proposed Jury Instruction No. 4, which allowed the jury to consider the interplay of two or more officers in the alleged deprivation of Plaintiff's constitutional rights. Plaintiff's Proposed Jury Instruction No. 4 stated, "The law regards anyone who commands, directs, advises, encourages, procures, instigates, promotes, controls, aids, or abets a wrongful act by another as being just as responsible for the wrongful act as the one who actually committed it." Plaintiff is not entitled to a new trial because Defendants' Supplemental Proposed Jury Instruction No. 14 is a correct statement of the law and the Court gave Plaintiff's Proposed Jury Instruction No. 4, which permitted the jury to

consider the interplay of two or more officers in the alleged events.

### 5.  **Comparative Fault**

Plaintiff argues that the Court erroneously gave Defendants' Supplemental Proposed Jury Instructions No. 20 (as modified), No. 21, and No. 22[17] and that instructing the jury

---

[17] Defendants' Supplemental Proposed Instruction No. 20 states:

> Evidence of intoxication may be considered in combination with all other conduct, under the circumstances shown by the evidence, in arriving at your decision as to whether any party exercised or failed to exercise ordinary care.

The Court notes that although Plaintiff's Motion for New Trial indicates that the Court gave a modified version of Defendants' Supplemental Proposed Instruction No. 20, the Court did not give a modified version of that instruction.

Defendants' Supplemental Proposed Instruction No. 21 states:

> You must determine whether any of the parties in this case were negligent and whether such negligence on the part of a party was a legal cause of Plaintiff's injuries or damages.  If you find that at least one defendant was negligent and such negligence was a legal cause of the injuries or damages, you must determine the total amount of plaintiff's damages, without regard to whether plaintiff's own negligence was also a legal cause of the injuries or damages.
> If you find that more than one party was negligent and the negligence of each was a legal cause of the injuries or damages, then you must determine the degree to which each party's negligence contributed to the injuries or damages, expressed in percentage.

regarding comparative fault was prejudicial because it allowed

the jury to blame Plaintiff for what happened to him and to

conclude that Defendants did nothing wrong.  (Pl.'s Mot. For New

Trial at 8).

Hawaii Revised Statutes ("HRS") section 663-31

provides:

> Contributory negligence shall not bar
> recovery in any action by any person or the
> person's legal representative to recover
> damages for negligence resulting in death or
> in injury to person or property, if such
> negligence was not greater than the
> negligence of the person or in the case of
> more than one person, the aggregate
> negligence of such persons against whom
> recovery is sought, but any damages allowed
> shall be diminished in proportion to the
> amount of negligence attributable to the
> person for whose injury, damage or death
> recovery is made.

HRS § 663-31(a).  HRS section 663-31(d) further directs that

"[t]he court shall instruct the jury regarding the law of

---

> The percentages allocated to the parties must
> total 100%.

> Defendants' Supplemental Proposed Instruction No. 22
states:
> If you find that Plaintiff's negligence
> is 50% or less, the Court will reduce the
> amount of damages you award by the percentage
> of negligence you attribute to Plaintiff.
> If, on the other hand, you find that
> Plaintiff's negligence is more than 50%, the
> Court will enter judgment for defendants on
> Plaintiff's negligence claim and Plaintiff
> will not recover any damages on that claim.

51

comparative negligence where appropriate."

Here, the evidence presented at trial indicates that prior to his arrest on October 9, 2000 Plaintiff 1) consumed an unknown amount of hard alcohol 2) failed a sobriety test; and 3) was involved in a fight in which he was struck and fell to the ground. Additionally, the evidence also supported the possibility that Plaintiff's alleged injuries were caused by a fall sustained at his home, after his release from police custody. Because there is credible evidence that Plaintiff's injuries may have been caused by the fight that he was involved in prior to his arrest or a fall sustained after his release from police custody, the jury was properly instructed to consider whether Plaintiff was contributorily negligent in causing his injuries. Even if one were to assume that Plaintiff sustained his alleged injuries while in the custody of the HPD, given the evidence of Plaintiff's intoxication, the jury was properly instructed to determine whether Plaintiff was contributorily negligent.

Finally, in Johnson v. Robert's Hawaii Tour, Inc., 664 P.2d 262, 269 (1983), the Hawaii Intermediate Court of Appeals addressed whether a trial court erred in giving an instruction based on the exact same language as used, here, in Defendants' Supplemental Proposed Instruction No. 20 which states, "Evidence of intoxication may be considered in combination with all other

conduct, under the circumstances shown by the evidence, in arriving at your decision as to whether any party exercised or failed to exercise ordinary care." In <u>Johnson</u>, the Hawaii Intermediate Court of Appeals held that the instruction is a correct statement of the law, and thus, the instruction did not render the instructions as a whole prejudicially insufficient, erroneous, inconsistent or misleading. <u>Id.</u> (citations omitted).

Here, as in <u>Johnson</u>, Defendants' Supplemental Proposed Instruction No. 20 simply informed the jury that intoxication was only one of the circumstances to be taken into consideration in determining whether any party exercised or failed to exercise ordinary care, and thus did not, as Plaintiff suggests, impermissibly allow the jury to overlook Defendants' conduct entirely. Moreover, where there is a causal relationship between the intoxication and the injuries complained of, a person's voluntary intoxication may constitute contributory negligence. See <u>Taylor-Rice v. State of Hawaii</u>, 979 P.2d 1086, 1102 (Haw. 1999); <u>Methven-Abreu v. Hawaiian Ins. & Guarantee Co.</u>, 834 P.2d 279, 288 (1992); <u>McKenna v. Volkswagenwerk Aktiengesellschaft</u>, 468 P.2d 1018, 1024 (1977). Therefore, it was proper for the Court to give Defendants' Supplemental Proposed Jury Instructions Nos. 20, 21, and 22, and Plaintiff is not entitled to a new trial on that basis.

## CONCLUSION

For the reason discussed above, the Court DENIES
Plaintiff's Motion for New Trial.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii,_____JAN 0 6 2006_____.


_____
United States District Judge

_____
Mitchell v. City and County of Honolulu, et al.; Civ. No. 02-00648
ACK-LEK; ORDER DENYING PLAINTIFF'S MOTION FOR NEW TRIAL.